IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| ANASTASIA FORSTON-KEMMERER, | ) | |
| | ) | No. 34640-4-III |
| Appellant, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ALLSTATE INSURANCE COMPANY, | ) | PUBLISHED OPINION |
| | ) | |
| Respondent. | ) | |

SIDDOWAY, J. — Anastasia Fortson-Kemmerer filed this lawsuit against her

insurer, Allstate Insurance Company, alleging Allstate violated the Insurance Fair

Conduct Act (IFCA), RCW 48.30.015, and acted in bad faith in investigating her claim

for underinsured motorist (UIM) coverage. That claim was resolved in an earlier action

by an award of $44,151.11 following mandatory arbitration.

The trial court granted summary judgment dismissing this second action on the basis that Ms. Fortson-Kemmerer's action to enforce the UIM provision of her policy was res judicata as to her bad faith and IFCA claims. Whether final judgment resolving a UIM claim precludes a later claim for insurer bad faith is a question of first impression for a Washington court.

A single lawsuit that combines UIM and bad faith claims places the insurer, both pretrial and at trial, in two different legal postures with prejudicial consequences. There is no dispute that Allstate prefers to resolve such claims separately and would have sought bifurcation and a stay of the bad faith claim had it been asserted earlier. Because of this difference in the insurer's quality as a party in the two types of actions, the UIM action was not res judicata as to this action. We reverse and remand.

## FACTS AND PROCEDURAL BACKGROUND

In December 2005, Anastasia Fortson-Kemmerer was in a collision with a motorist who fled the scene, was never identified, and is presumed uninsured. Ms. Fortson-Kemmerer was insured by Allstate Insurance Company. She eventually sent a demand letter to Allstate requesting $75,000 in UIM benefits for injuries and damages she incurred as a result of the collision. She stated in her letter that if Allstate did not pay the amount requested, she would bring a lawsuit to enforce payment of her benefits under the policy and for the remedies and penalties provided by IFCA.

2

Shortly thereafter, Allstate made a counteroffer of $9,978, which Ms. Fortson-Kemmerer rejected. Allstate then requested and obtained a medical examination of Ms. Fortson-Kemmerer, after which it renewed its offer of $9,978. Ms. Fortson-Kemmerer rejected it again.

In 2011, Ms. Fortson-Kemmerer sued Allstate, which had been reporting monthly that it was continuing to investigate her claim. She still sought $75,000.00 in UIM benefits. Following mandatory arbitration, she was awarded $44,151.11. Allstate made a post-award offer of $25,000.00 that she rejected, after which Allstate paid the award.

Ms. Fortson-Kemmerer then filed this action against Allstate, alleging it had acted in bad faith and violated IFCA by failing to conduct a reasonable investigation into her claim, constructively denying her claim, and compelling her to bring a lawsuit to recover what she was owed under her insurance policy.

Allstate raised the affirmative defense that her action to enforce the UIM provision of her policy operated as res judicata and barred her bad faith claim. It then moved for summary judgment on that basis.

Ms. Fortson-Kemmerer responded with evidence that in other cases in which insureds combine UIM claims with what we will refer to hereafter, generically, as bad

3

faith claims,[1] Allstate and other insurers often persuade courts to bifurcate not only trial, but also discovery. The insurers advance arguments such as the following:

- That "[a] claim for breach of contract against an insurance company is significantly different than a claim that in breaching the insurance contract the insurance company somehow acted in bad faith";[2]

- That "[i]t is judicially recognized that . . . the evidence necessary to support a bad faith claim is 'very different from that necessary to support a claim for UIM benefits,'" since "[t]he focus of discovery and trial of the UIM claims relates solely to the *plaintiff's* bodily injuries and medical treatment," while "[c]onversely, the focus of discovery and trial on the bad faith claims is on *Allstate's* conduct";[3]

- That until the fact finder has determined the dollar value of the UIM claim, "there is no way to know whether a bad faith claim based upon an alleged failure to properly evaluate, negotiate and settle a UIM claim is even colorable";[4]

- That "[n]one" of the "eyewitnesses, investigating officers, medical providers, and experts" who will testify to the accident related claims "has a remote scintilla of evidence relevant to the insurance claims," and "evidence about

---

[1] We use the generic "bad faith claims" to include actions for common law bad faith and claims that an insurer has violated IFCA or the Consumer Protection Act, chapter 19.86 RCW.

[2] Clerk's Papers (CP) at 62 (citing a submission by Allstate in *Sayler v. Allstate*, No. 06-02-03067-7 (Spokane County Super. Ct., Wash.)).

[3] CP at 64 (quoting a submission by Allstate in *Krett v. Allstate Insurance Co.*, No. 2:13-cv-00131 RSL (W.D. Wash.)).

[4] CP at 63 (citing a different submission by Allstate in the *Krett* case).

4

Allstate's evaluation and handling of the claim is not at all relevant to the accident-related claims";[5] and

- That without bifurcation and a stay of discovery as to the bad faith claim, an insurer's defense "will be prejudiced," since it will be "required to produce its UIM file and internal privileged documents to plaintiff before the UIM claim is resolved."[6]

Ms. Forston-Kemmerer's evidence included seven bifurcation and stay orders that Allstate or other insurers obtained in Washington courts, state and federal, between 2009 and 2013, in cases in which plaintiff-insureds asserted UIM and bad faith claims in the same lawsuit. Six of the orders not only bifurcated trial of the UIM and bad faith claims, but also bifurcated discovery and stayed discovery addressing bad faith until after the UIM claim was resolved. The following language from one order is representative of orders contemplating what are not back-to-back trials, but, in essence, one lawsuit turned into two:

> Plaintiffs' UIM claim is hereby bifurcated from plaintiffs' "bad faith claims" for purpose of both discovery and trial, and all discovery in the trial of plaintiffs "bad faith claims" are hereby stayed until after plaintiffs' claim for Underinsured Motorist (UIM) benefits has been fully resolved.

Clerk's Papers (CP) at 76.

In addition to opposing Allstate's summary judgment motion, Ms. Forston-

---

[5] CP at 65 (citing a submission by Allstate in *Young v. Allstate Ins. Co.*, No. 09-2-42284-2 SEA (King County Super. Ct., Wash.)).

[6] CP at 114, 113 (citing a submission by Allstate in *Krett*).

5

No. 34640-4-III
*Forston-Kemmerer v. Allstate Ins. Co.*

Kemmerer sought a continuance under CR 56(f), arguing that discovery could yield even more evidence that when Allstate's insureds join UIM and bad faith claims, Allstate regularly seeks what are in effect separate lawsuits, citing prejudice and significant differences between UIM and bad faith claims. She argued information of Allstate's prior practice was relevant to res judicata and to whether Allstate should be judicially estopped from asserting claim preclusion as an affirmative defense.

The trial court denied Ms. Fortson-Kemmerer's motion to continue and granted summary judgment dismissal of her claim. Ms. Fortson-Kemmerer appeals.

ANALYSIS

Res judicata or modernly, claim preclusion,[7] "acts to prevent relitigation of claims that were or should have been decided among the parties in an earlier proceeding." *Norris v. Norris*, 95 Wn.2d 124, 130, 622 P.2d 816 (1980). For almost a century, Washington cases have held that for a judgment to operate as res judicata in a subsequent action "there must be a concurrence of identity in four respects: (1) of subject-matter; (2) of cause of action; (3) of persons and parties; and (4) in the quality of the persons for or against whom the claim is made." *N. Pac. Ry. Co. v. Snohomish County*, 101 Wash. 686,

---

[7] For the most part, we use the term "claim preclusion," which is arguably narrower and more clearly refers only to preclusion of relitigating a claim, not an issue. *See* Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L. REV. 805 (1985); *Taylor v. Sturgell*, 553 U.S. 880, 892 n.5, 128 S. Ct. 2161, 171 L. Ed. 2d 155 (2008).

6

688, 172 P. 878 (1918); *Hisle v. Todd Pac. Shipyards Corp.*, 151 Wn.2d 853, 865-66, 93 P.3d 108, *aff'd*, 151 Wn.2d 853, 93 P.3d 108 (2004); Philip A. Trautman, *Claim and Issue Preclusion in Civil Litigation in Washington*, 60 WASH. L. REV. 805, 812 & n.48 (1985) (observing in 1985 that "scores" of Washington cases had "stated for almost seven decades" that a judgment has preclusive effect only if the successive proceedings are identical in the four respects). "Res judicata is an issue of law, subject to de novo review on appeal." *Berschauer Phillips Const. Co. v. Mut. of Enumclaw Ins. Co.*, 175 Wn. App. 222, 227, 308 P.3d 681 (2013). Allstate, as the party asserting claim preclusion, bears the burden of proof. *Hisle*, 151 Wn.2d at 865.

Allstate relies on language from a number of cases to the effect that claim preclusion prohibits the relitigation of cases that "could have" or "might have" been asserted in earlier litigation, as if that simpler criterion can substitute for the four required identities. Since Ms. Fortson-Kemmerer's first demand letter threatened to sue for IFCA remedies and penalties, Allstate argues that of course she "could have" advanced IFCA and bad faith claims in her first lawsuit. But none of the cases cited by Allstate has ever retreated from the four identities required to establish claim preclusion. And Allstate's argument was directly rejected in *Seattle-First National Bank v. Kawachi*, 91 Wn.2d 223, 225-28, 588 P.2d 725 (1978), in which a plaintiff's claims had not been adjudicated in a prior action, but the defendants maintained that "the claims should be barred because they

*could* have been decided in that suit." *Id.* at 226 (emphasis added). As the court explained:

> While it is often said that a judgment is res judicata of every matter which could and should have been litigated in the action, this statement must not be understood to mean that a plaintiff must join every cause of action which is joinable when he brings a suit against a given defendant. CR 18(a) permits joinder of claims. It does not require such joinder. And the rule is universal that a judgment upon one cause of action does not bar suit upon another cause which is independent of the cause which was adjudicated. 50 C.J.S. *Judgments* § 668 (1947); 46 Am. Jur. 2d *Judgments* § 404 (1969). A judgment is res judicata as to every question which was *properly a part of the matter in controversy*, but it does not bar litigation of claims which were not in fact adjudicated.

*Id.* (emphasis added). Essentially, it is the four required identities that enable us to determine whether a question was "properly a part" of an earlier matter in controversy.

We therefore look to the four required identities. Ms. Forston-Kemmerer concedes that the parties are identical. She disputes that any of the remaining three factors is. While she advances argument and authority in support of her position that the UIM and bad faith claims lack three of the required identities, she suggested at oral argument that the narrowest ground on which we can reverse the trial court is the different "quality" of Allstate's defense in UIM and bad faith cases. It is that different quality that accounts for Allstate's and other insurers' efforts—and their success—in persuading courts to treat UIM and bad faith claims joined in a single lawsuit as if the claims had been brought separately.

8

We examine the nature of UIM and bad faith claims, why joining them in one lawsuit is problematic, the few claim preclusion decisions from other jurisdictions in which the common practice of severing or bifurcating UIM and bad faith claims has been considered, and the several Washington decisions that address what it means for parties to have an identical "quality" with respect to two claims. We conclude that where a party's different posture as to two claims makes it prejudicial for the claims to proceed in the same lawsuit, this is a different "quality" that prevents the claims from being identical for claim preclusion purposes. A UIM claim therefore does not preclude a subsequent bad faith action.

*I.    The unique character of a UIM claim, and why it prompts courts to treat UIM and bad faith claims that are joined as if they were separate actions*

The purpose of the Washington statute requiring insurers doing business in Washington to offer UIM coverage is to allow an injured party to recover those damages the injured party would have received had the responsible party been insured with liability limits as broad as the injured party's UIM limits. *Hamilton v. Farmers Ins. Co.*, 107 Wn.2d 721, 726, 733 P.2d 213 (1987). Coverage eligibility requires the insured to demonstrate that he or she is "legally entitled to recover damages" from the underinsured motorist "because of bodily injury, death, or property damage." RCW 48.22.030(2). A tort judgment against the tortfeasor establishes conclusively the damages to which the

9

insured is "legally entitled." *Fisher v. Allstate Ins. Co.*, 136 Wn.2d 240, 247-48, 961

P.2d 350 (1998).

"The insurance carrier which issued the policy stands, therefore, in the shoes of

the uninsured motorist to the extent of the carrier's policy limits." *State Farm Mut. Auto.*

*Ins. Co. v. Bafus*, 77 Wn.2d 720, 724, 466 P.2d 159 (1970). It "may defend as the

tortfeasor would defend" and "strategiz[e] the same defenses that the tortfeasor could

have asserted." *Cedell v. Farmers Ins. Co. of Wash.*, 176 Wn.2d 686, 697, 295 P.3d 239

(2013). A UIM insurer's relationship with its insured in the action to enforce UIM

coverage is therefore "'by nature adversarial and at arm's length.'" *Ellwein v. Hartford*

*Accident & Indem. Co.*, 142 Wn.2d 766, 779, 15 P.3d 640 (2001), *overruled on other*

*grounds by Smith v. Safeco Ins. Co.*, 150 Wn.2d 478, 486, 78 P.3d 1274 (2003) (quoting

*Fisher*, 136 Wn.2d at 249). This is markedly unlike first party bad faith claims, in which

insurers are recognized as having a quasi-fiduciary duty to act in good faith toward their

insureds. *Cedell*, 176 Wn.2d at 696.

Ms. Forston-Kemmerer demonstrates that when an insured joins her UIM and bad

faith claims, insurers are often able to obtain a stay and bifurcation order that effectively

transforms the one lawsuit into two: a UIM lawsuit, followed by a bad faith lawsuit.

While no reported Washington decision has required or endorsed such a procedure,

insurers often obtain bifurcation and stay orders in Washington courts by relying on cases

from other jurisdictions, analogous Washington case law,[8] and by identifying for Washington courts the problems presented when discovery and trial of the claims proceed simultaneously.

Texas courts have held that it is always an abuse of discretion for a trial court to refuse to sever a UIM claim for initial trial and abate any bad faith claims asserted in the same action if the insurer has made a settlement offer, because the evidence of the offer, which the insurer will want to present in defense of the bad faith claim, will prejudice it in the UIM action. *In re State Farm Mut. Auto. Ins. Co.*, 395 S.W.3d 229, 234 (Tex. App. 2012). Texas courts will grant mandamus relief if a trial court denies severance of such claims. *Id.* at 237; *accord In re United Fire Lloyds*, 327 S.W.3d 250, 257 (Tex. App. 2010). In *Lloyds*, the court characterized UIM contracts as "unique" for severance and abatement purposes, citing the Texas Supreme Court's observation that unlike other first party insurance contracts in which the policy alone dictates coverage, "'UIM insurance utilizes tort law to determine coverage. Consequently, the insurer's contractual obligation to pay benefits does not arise until liability and damages are determined'"—

---

[8] Allstate has pointed in the past to *Roberts v. Safeco Insurance Co.*, 87 Wn. App. 604, 941 P.2d 668 (1997) (bad faith claim was properly dismissed on summary judgment where insured might have been fully compensated for her loss, which required that her actual damages first be determined) and *Escalante v. Sentry Insurance Co.*, 49 Wn. App. 375, 381, 743 P.2d 832 (1987), *overruled on other grounds by Ellwein*, 142 Wn.2d 766, 779 (mentioning that the trial court had stayed insured's bad faith claim pending mandatory arbitration of the issue of the amount of damages payable under the policy). CP at 117-18.

that being the liability of the *underinsured motorist*, and the damages proved recoverable against him or her. *Id.* at 255 (quoting *Brainard v. Trinity Universal Ins. Co.*, 216 S.W.3d 809, 818 (Tex. 2006)).

Similarly, in Rhode Island, "claims of insurer bad faith are severed and tried separately from the breach of insurance contract claim, a procedure that provides the insurer with significant procedural protections, including nondisclosure of its file until the completion of the breach-of-contract action." *Skaling v. Aetna Ins. Co.*, 799 A.2d 997, 1010 (R.I. 2002). And in *Garg v. State Automobile Mutual Insurance Co.*, the Ohio appellate court held that it would be "grossly prejudicial to [the insurer] and, thus, an abuse of discretion" for the trial court not to bifurcate an insured's bad faith claim and stay discovery on that claim until the breach of contract claim was resolved. 155 Ohio App. 3d 258, 266, 800 N.E.2d 757 (2003). The court observed that requiring the insurer to divulge otherwise privileged information discoverable in connection with the bad faith claim "would unquestionably impact [the insurer's] ability to defend against" the contract claim. *Id.* at 267.

Finally, New Jersey has held that it is an abuse of discretion for a trial court to order that discovery on UIM and bad faith claims joined in a single suit proceed simultaneously, and that a severance motion must be granted in such cases. *Procopio v. Gov't Emps. Ins. Co.*, 433 N.J. Super. 377, 80 A.3d 749 (2013). Severance and stay "promotes judicial economy and efficiency by holding in abeyance expensive, time-

12

consuming, and potentially wasteful discovery on a bad faith claim that may be rendered moot by a favorable ruling for the insurer in the . . . UIM litigation." *Id.* at 381.

Only these jurisdictions mandate bifurcation and discovery stays where UIM claims and bad faith claims are joined. But the discretion for trial courts to stay discovery and require separate trials is widely recognized and often exercised. In a 1998 case involving Allstate, the West Virginia Supreme Court observed that "[a]s a general matter, whenever courts bifurcate and stay bad faith claims against insurers, the *trend* is to order a stay of discovery on the bad faith claim." *Light v. Allstate Ins. Co.*, 203 W. Va. 27, 35, 506 S.E.2d 64 (1998). A dissenting justice in that case, who would have mandated bifurcation and a discovery stay, summarized "[t]he compelling advantages of mandatory bifurcation and stay of discovery on first-party statutory bad faith claims:"

> (1) [C]ost savings to both parties, with increased incentive to settle before trial, (2) avoidance of burdensome and complicated discovery problems with insurance claims files, (3) avoidance of unfair prejudice to a litigant which arises when contract and bad faith claims are combined, and (4) avoidance of the possibility of the disqualification of trial counsel because of inherent conflict of interest problems. Gregory S. Clayton, *Bifurcation of Breach of Contract and Bad Faith Claims in First-Party Insurance Litigation*, 21 Vt. B.J. & L. Dig. 35 (1995).

*Id.* at 36 (McCluskey, J., dissenting).

> II. *Few courts have analyzed whether the bifurcation practice matters for claim preclusion purposes*

We have identified only a few reported decisions that consider whether this common practice of holding a bad faith case in abeyance until a UIM case is resolved is

13

relevant to whether final judgment in a UIM case should preclude a subsequent action for bad faith. All apply different standards than Washington's for determining the scope of a claim, but are nonetheless worth examining.

In the earliest, *Porn v. National Grange Mutual Insurance Co.*, 93 F.3d 31, 34 (1st Cir. 1996), the First Circuit Court of Appeals determined the scope of a claim for preclusion purposes by applying the "'transactional approach'" articulated in the *Restatement (Second) of Judgments* (AM. LAW INST. 1982). The *Restatement* focuses on "the transaction, or series of connected transactions, out of which the action arose." RESTATEMENT (SECOND) § 24(1). To determine what "factual grouping" constitutes a "'transaction'" and what groupings constitute a "'series,'" the *Restatement* requires a "pragmatic[ ]" determination, "giving weight to such considerations as whether the facts are related in time, space, origin, or motivation." Most important for present purposes, it also requires giving weight to "whether the[ facts] form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *Id.* at § 24(2).

Porn argued that his bad faith claim was not precluded by the final judgment on his contract claim because, in part, the bad faith facts did not form a convenient trial unit with the contract facts. *Porn*, 93 F.3d at 33. In the portion of its decision devoted to trial convenience, the First Circuit questioned this, reasoning that details of the collision required to be presented in the first case would "likely [be] repeated in the second." *Id.* at

14

36. Allstate's characterization of the overlap as "little if any" is more reflective of the Washington experience. CP at 126.[9] The determination of damages in the UIM action is binding in the bad faith action. *Neff v. Allstate Ins. Co.*, 70 Wn. App. 796, 803, 855 P.2d 1223 (1993); *Girtz v. N.H. Ins. Co.*, 65 Wn. App. 419, 422-23, 828 P.2d 90 (1992). It is true that a disparity between damages recovered and an insurer's offer will not alone establish that an insurer acted unfairly; the insured must present "something more." *Perez-Crisantos v. State Farm Fire & Cas. Co.*, 187 Wn.2d 669, 684, 389 P.3d 476 (2017). But the evidence in the second action will address the "something more"; the insurer cannot retry the issue of damages.

---

[9] Allstate explained to a federal judge in the Western District of Washington in 2013 that "there is little if any overlap of issues or discovery between plaintiffs UIM claim and plaintiff's bad faith claims." CP at 126 (quoting a submission by Allstate in the *Krett* case).

> The focus of discovery and trial of the UIM claims relates solely to the *plaintiff's* bodily injuries and medical treatment incurred as a result of the accident; discovery and trial on the UIM claims requires the plaintiff's testimony and testimony from his medical providers and fact witnesses. Conversely, the focus of discovery and trial on the bad faith claims is on *Allstate's* conduct, what Allstate did or did not do, and whether its actions were reasonable based upon the information it had at the time it evaluated and attempted to settle plaintiff's UIM claim. Discovery and trial on the bad faith claims requires the testimony of Allstate personnel as to what they knew and the basis for their actions as well as consideration of Allstate's claim handling materials and procedures. Neither plaintiff nor his medical providers or fact witnesses can provide testimony as to what Allstate knew or the reasons for Allstate's actions.

*Id.* at 125-26.

15

The First Circuit recognized that *Porn* relied less on differences in the evidence relevant to the two claims and more on prejudice: the fact that evidence about the amount of insurance, settlement offers, and negotiations essential to the bad faith claim would be prejudicial to the insurer on the UIM claim. *Porn*, 93 F.3d at 36. While not questioning the prejudice presented by a joint trial of the claims, the First Circuit concluded it could be addressed by bifurcation. Significantly, it did not contemplate any stay of discovery or a second trial. It contemplated back-to-back trials before a single jury, stating, "the evidence common to both claims . . . could have been presented *at once*," thereby avoiding a delay of months or years. *Id.* (emphasis added).

In a recent decision, the seven-member Iowa Supreme Court split, 4-3, on whether final judgment on a UIM claim precludes a later bad faith claim. The majority's holding that claim preclusion applies was premised on judicial economy and its stated expectation that there should be no difficulty combining the UIM and bad faith discovery processes so that trials can be conducted back-to-back, before a single jury. *Villareal v. United Fire & Cas. Co.*, 873 N.W.2d 714, 728 (Iowa 2016). Like the First Circuit in *Porn*, the bifurcation that the majority contemplated would "allow[ ] the evidence, common to both claims, to be presented at once." *Id.* at 728 (internal quotation marks omitted) (quoting *Salazar v. State Farm Mut. Auto. Ins. Co.*, 148 P.3d 278, 282 (2006).

One of the dissenting justices wrote separately (joined by a colleague) only to "stress that under the majority decision, district courts should not limit discovery when a

16

party joins a bad-faith claim with his or her underlying tort or contract claim." *Id.* at 731

(Wiggins, J., dissenting). Moreover,

> [A]lthough a court may require the jury to decide the underlying tort or
> contract claim prior to having it hear further evidence and decide the bad-
> faith claim, the trial should not be bifurcated when both claims are brought
> in the same action. Rather, the district court should allow discovery to
> proceed on both claims and try both claims in the same trial.

*Id.* Otherwise, Justice Wiggins observed, little was accomplished by precluding a later

bad faith claim. *Id.*

A third justice, joined by one of his colleagues, would have reversed dismissal of

the insured's claim and allowed the bad faith claim to proceed to trial. *Id.* at 731 (Appel,

J., dissenting). In his view, application of Iowa's same-claim, same-evidence principles

supported the position of the insured and would not allow application of claim preclusion

in the case—and "the mere fact that the bad-faith claim could have been brought earlier

clearly is not determinative." *Id.* at 737. To the extent the *Restatement (Second) of

Judgment*'s transactional approach taken into consideration by the majority was

inconsistent with Iowa's prior caselaw, he "would not follow it." *Id.* at 738.

In *Bankruptcy Estate of Lake Geneva Sugar Shack, Inc. v. General Star Indemnity

Co.*, 200 F.3d 479 (7th Cir. 2000), the Seventh Circuit Court of Appeals reversed a

district court's dismissal of a bankruptcy estate's bad faith lawsuit on claim preclusion

grounds. The decision turned in part on the likelihood that the parties, the court, or all of

them intended that the bad faith claim could proceed after the contract claim. (The

17

insurer, aka GenStar, denied that it had any such intent.) The court was persuaded by the procedural history and by the problems with trying the claims together:

> There was no issue of judicial economy and no way to avoid two trials. Even had the bad faith claim been filed in Walworth County, the state court judge stated that he would have tried that claim separately from the rest of the case. That suited GenStar, which quite naturally wanted bad faith issues kept out of the first trial.

*Id.* at 483.

The Seventh Circuit also observed that the district court had erred by conducting a "*Restatement*-based[ ] analysis" rather than heeding Wisconsin law. *Id.* at 482. In reversing and remanding the bad faith claim for trial, the court observed that its conclusion "is consistent with the long-standing view of the Wisconsin courts that a breach of contract claim and a bad faith claim are separate claims" because a "bad faith claim is not based on the policy . . . as is the breach of contract claim . . . but grows out of a breach of a duty to properly investigate a claim." *Id.* at 484.

Finally, in *Sazegari v. Geico General Insurance Co.*, No. Civ.A.304CV679H, 2005 WL 1631013 (W.D. Ky. July 8, 2005) (court order), a case similar to *Sugar Shack*, the district court found that parties who dismissed a bad faith claim from a lawsuit in which both contract and bad faith claims had originally been asserted probably meant to do so without prejudice, intending that the bad faith claim would proceed later. (Here, too, Geico, arguing for claim preclusion, denied any such intent.) Among other

18

reasoning, the court stated that applying the "consent" exception to the rule against claim

splitting "does not offend the underlying purposes of claim preclusion," in part because

> separate proceedings will not unduly waste judicial resources. The claims
> would likely have proceeded separately anyway. Actions against an insurer
> for breach of contract and bad faith are often bifurcated. Indeed, Geico had
> requested bifurcation in the underlying action here. Under these particular
> circumstances, the Court concludes that Kentucky courts would not apply
> claim preclusion.

*Id.* at *4 (citation omitted).

> III.    *Washington case law addressing "the quality of the persons for or against
>         whom a claim is made" treats it as an independent, fourth required identity*

In most Washington cases addressing claim preclusion in which the parties are the

same, there has been no contention that there is a difference in the parties' quality. Only

a few cases address the required identity "in the quality of" a party.

*Flessher v. Carstens Packing Co.*, 96 Wash. 505, 165 P. 397 (1917) has been

characterized as an early case in which the quality of a party was relevant. *Berschauer*,

175 Wn. App. 231 & n.21. Mr. Flessher's 10-year-old daughter suffered permanent

injuries after ingesting diseased meat obtained from Carstens. It was the law at the time

that "when a minor is injured, two causes of action arise, one in favor of the minor for

pain and suffering and permanent injury, the other in favor of the parent for loss of

services during minority and expenses of treatment." *Flessher*, 96 Wash. at 509. Yet

there had been cases where a parent, as guardian ad litem in the child's action, had sought

and recovered expenses to which he was entitled as a parent. When that happened, case

19

law held that the parent was deemed to "'have emancipated his [child] in so far as the right to recover damages which were included in the [child's] suit is concerned.'" *Id.* at 510 (quoting *Donald v. Ballard*, 34 Wash. 576, 578, 76 P. 80 (1904)). The parent, qua parent, was not permitted to obtain a second recovery of the expenses in his own suit.

Mr. Flessher brought a first action as guardian ad litem for his daughter. Thereafter, he brought his own action. At issue was whether he had already recovered the damages in his daughter's action that the law allowed him to recover as a parent. The court found that in his daughter's action, he had recovered damages for loss of his daughter's services, but had not recovered the expenses of her treatment. His daughter's suit was therefore held to preclude his claim as a parent for the former damages, but not the latter.

In 1983, Justice James M. Dolliver discussed the required identity "in the quality of" a party in two decisions, filed a week apart. The first was *Mellor v. Chamberlin*, 100 Wn.2d 643, 673 P.2d 610 (1983). Mr. Mellor purchased two office buildings from the Chamberlins. He first sued them after learning that a parking lot to the north of the buildings, used by his tenants, belonged to the adjoining landowner, from whom he was required to lease the lot. He claimed that the Chamberlins had falsely represented the parking lot as being included in the sale of the buildings. *Id.* at 644. That lawsuit was settled and dismissed.

20

Later, after paying off the real estate contract and receiving a warranty deed, Mr. Mellor settled an encroachment issue with the same adjoining neighbor and brought a second suit against the Chamberlins for breach of the covenant of warranty and peaceful possession. *Id.* at 645. The Chamberlins moved to dismiss the action on claim preclusion grounds, demonstrating that the neighbor informed Mr. Mellor of the encroachment before his first suit against them.

After determining that the subject matter and causes of action were different in the two cases, Justice Dolliver turned to whether the parties were different in identity or quality:

> Clearly, the identity of the parties was the same; their "quality" differed, however, as the causes of action changed from misrepresentation to breach of covenant of title. Hence, we hold the second action is not barred by res judicata as the concurrence of identity in three out of the four elements is missing.

*Id.* at 646. While the decision does not elaborate on the "quality" difference, the first suit was against the Chamberlins as active tortfeasors whereas the second was based on their status as grantors of a warranty deed that had not been delivered at the time of the first lawsuit.

The second of Justice Dolliver's opinions was *Rains v. State*, 100 Wn.2d 660, 674 P.2d 165 (1983). George Rains had first sued members of the Washington Public Disclosure Commission (PDC) in federal court, claiming they had violated his civil rights. His suit was dismissed. He then brought a second action in state court against the

21

State of Washington and the PDC. In affirming the trial court's dismissal of the second action on claim preclusion grounds, the court found a concurrence of the four identities, stating that the parties, although differently named on the complaints, "were 'qualitatively' the same." *Id.* at 664. It stated, "Identity of parties is not a mere matter of form, but of substance." *Id.* (internal quotation marks omitted) (quoting *Sunshine Anthracite Coal Co. v. Adkins*, 310 U.S. 381, 402, 60 S. Ct. 907, 84 L. Ed. 1263 (1940)).

> *IV. Allstate fails to demonstrate an identity in its quality in the UIM and bad faith claims*

The Washington cases can all be said to apply "quality" in its following sense:

> [A] character, position, or role usu. assumed temporarily : CAPACITY —
> usu. used in the phrases *in quality of, in the quality of* <I make this inquiry
> in ~ of an antiquary —Thomas Gray> <in the ~ of reader and companion
> —Joseph Conrad>

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1858 (2002). And in that sense, Allstate had a different quality in Ms. Forston-Kemmerer's UIM arbitration than it has in this case. In the UIM arbitration, it defended against her claim for damages from the collision "in the shoes of the underinsured motorist" and as a pure adversary. *Bafus*, 77 Wn.2d at 724. In this case, it will defend in a quasi-fiduciary role, as her insurer.

The doctrine of res judicata exists "to 'prevent relitigation of already determined causes and curtail multiplicity of actions and harassment in the courts.'" *Loveridge v. Fred Meyer, Inc.*, 125 Wn.2d 759, 763, 887 P.2d 898 (1995) (quoting *Bordeaux v. Ingersoll Rand Co.*, 71 Wn.2d 392, 395, 429 P.2d 207 (1967)). The facts of this case

22

provide a new paradigm for when the difference in the quality of persons against whom a claim is made prevents claim preclusion: it prevents claim preclusion when a party's different posture as to two claims makes it prejudicial for the claims to proceed in the same lawsuit, and that prejudice is well borne out by practice and case law, as it is here.

This paradigm is consistent with the meaning of "in the quality of" as understood when the four required identities were first announced by our Supreme Court. It serves the purpose of res judicata. Allowing the bad faith action to be pursued after resolution of the UIM action does not result in relitigation of an already determined cause. It does not give rise to a multiplicity of pretrial and trial processes that would not also occur if a single lawsuit were brought and bifurcation and a stay were requested and ordered. It does not countenance harassment in the courts but only a manner of proceeding that is reasonable under the circumstances. We also observe that although Washington has not adopted the approach of the *Restatement (Second) of Judgments* (nor do we suggest that it should),[10] this new paradigm reflects a pragmatic approach, reflecting how bad faith claims often proceed.

---

[10] As pointed out by Professor Tegland, portions of the *Restatement (Second) of Judgments* remain controversial and may not be supported by Washington law. 14A KARL B. TEGLAND, WASHINGTON PRACTICE: CIVIL PROCEDURE § 35:20, at 508 n.1 (2d ed. 2009).

23

No. 34640-4-III
*Forston-Kemmerer v. Allstate Ins. Co.*

Because Allstate fails to demonstrate an identity in its quality in the arbitration of damages and the present bad faith claims, this action is not precluded. We reverse and remand for further proceedings.

_____
Siddoway, J.

WE CONCUR:

_____
Korsmo, J.

_____
Pennell, J.